IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 11, 2006

## EDDIE WAYNE GORDON v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Gibson County**
**No. 12785    Jerry Scott, Senior Judge**

_____

**No. W2005-02330-CCA-R3-PC  - Filed May 4, 2006**

_____

The petitioner, Eddie Wayne Gordon, appeals the Gibson County Circuit Court's denial of his petition for post-conviction relief from his guilty plea to first degree murder and resulting life sentence.  He contends that he received the ineffective assistance of counsel and that his guilty plea was involuntary.  Upon review of the record and the parties' briefs, we affirm the post-conviction court's judgment that the petitioner received the effective assistance of counsel.  However, because the post-conviction court failed to address the issue of whether the petitioner pled guilty voluntarily, the case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part, Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

Timothy Boxx, Dyersburg, Tennessee, for the appellant, Eddie Wayne Gordon.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Garry G. Brown, District Attorney General; and Elaine Todd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

The record reflects that on the morning of August 12, 1983, the petitioner set his ex-girlfriend's sister's house on fire.  When the petitioner's ex-girlfriend and her sister came out of the house, the petitioner shot and killed his ex-girlfriend, who was carrying their young child.  The petitioner confessed to killing the victim and was indicted for first degree murder and arson.  He pled guilty to first degree murder, and the trial court sentenced him to life imprisonment.  The petitioner

timely filed a pro se petition for post-conviction relief, which the trial court dismissed in 1985 without an evidentiary hearing. In 1986, this court ordered the trial court to appoint counsel and afford the petitioner an evidentiary hearing. See Eddie Wayne Gordon v. State, 1986 Tenn. Crim. App. LEXIS 2200 (Jackson, Jan. 29, 1986). Although counsel was appointed, an evidentiary hearing was never held, and the trial court dismissed the petition for failure to prosecute in 1987. The case "languished in the system," and in 2004, this court again ordered the trial court to conduct an evidentiary hearing. Eddie Wayne Gordon v. State, No. W2003-02376-CCA-R3-PC, 2004 Tenn. Crim. App. LEXIS 421, at *3 (Jackson, May 7, 2004). In January 2005, appointed counsel filed an amended petition for post-conviction relief, claiming that the petitioner received the ineffective assistance of counsel because his trial attorneys did not seek an independent psychiatric evaluation for him and that his guilty plea was involuntary.

At the evidentiary hearing, Tim Mullins testified for the petitioner that he was the petitioner's cousin.[1] On the night of August 11, 1983, the petitioner came to Mullins' house, and they watched television. The petitioner did not appear to be his usual self and was very quiet. Mullins had known the petitioner to drink alcohol and smoke marijuana, but Mullins did not see the petitioner use those substances that night. The petitioner and the victim had been having disagreements about their child, and the petitioner's baby "meant everything in the world to him." The petitioner's trial attorneys never interviewed Mullins.

Barbara Collins, the petitioner's mother, testified that she, her aunt, and her mother talked with the petitioner's trial attorneys in the judge's chambers on October 24, 1983, the day of the petitioner's guilty plea. The attorneys wanted the petitioner to accept the State's plea offer, but the petitioner did not want to plead guilty. The attorneys told Collins and her family to convince the petitioner to accept the State's plea offer, and one of the attorneys told her that he would only represent the petitioner if the petitioner accepted the offer. At some point, the attorneys left Collins and her family alone with the petitioner. Collins was afraid the petitioner would get the death penalty at trial, and she and her family wanted the petitioner to accept the State's offer. While they talked with the petitioner, the trial judge came into the room. The petitioner never denied killing the victim but kept saying that he wanted to go to trial. On cross-examination, Collins testified that the petitioner's attorneys probably talked with her about the petitioner's options but that she did not remember their conversation. She acknowledged that she was afraid the State would seek the death penalty against the petitioner and that she encouraged him to plead guilty. She thought that if the petitioner pled guilty, he would be released from prison in about ten years.

Earline Mullins, the petitioner's great-aunt, testified that she met with the petitioner's attorneys on the day of the guilty plea and that the attorneys told the petitioner he would get a ninety-nine-year sentence with no possibility of parole if he did not accept the State's offer. They also told

---

[1]We note that the petitioner's brief does not comply with Tennessee Rule of Evidence 27(a)(6). Pursuant to the rule, it is the appellant's duty to include in his brief a statement of the facts relevant to the issues on appeal with appropriate record references. The statement of facts in the petitioner's brief contains no evidence presented at the evidentiary hearing.

the petitioner that "we're not going back in the courtroom until [you take] the plea bargain." The attorneys told him that he would get life with parole in thirty years if he pled guilty. The petitioner replied, "I'd rather jump out that window." The attorneys left the room, and Mullins and her family talked with the petitioner about the State's offer. Mullins acknowledged that she and her family "pounded on" the petitioner in order to get him to accept the State's offer, and she said she never saw the trial judge in the room while they talked with the petitioner. The petitioner was living at her house at the time of the crimes, but the petitioner's attorneys never interviewed her. On cross-examination, Mullins testified that she did not remember hearing the attorneys say anything about the death penalty. Nevertheless, she and her family advised the petitioner to plead guilty because "we thought it'd be best for him to get out on parole."

One of the petitioner's trial attorneys testified that he started practicing law in 1979 and was appointed to represent the petitioner in August 1983. He described his recollection of the case as "fair" and said that he did not remember any of his conversations with the petitioner. However, his notes from the case reflected that he and co-counsel talked with the petitioner about the facts of the case and that he talked with the petitioner and the petitioner's family on the day of the guilty plea. Counsel did not remember if he visited the crime scene, but he interviewed witness Tommy Hunt. Counsel also had some witnesses' statements. Counsel remembered telling the petitioner that the petitioner faced the possibility of the death penalty. The State offered to let the petitioner plead guilty in return for a life sentence, and counsel talked with the petitioner about "the pros and the cons" of the State's offer. Counsel told the petitioner that the State had to prove its case beyond a reasonable doubt, but he did not remember explaining the difference between first and second degree murder to him. He and the petitioner discussed possible defense strategies such as an alibi and an insanity defense. However, the petitioner told counsel that he had been upset with the victim for quite some time, had thought about killing her for hours, and had planned the killing.

Counsel acknowledged that doctors evaluated the petitioner at the Gibson County Mental Health Center and found the petitioner to be competent. Counsel did not interview the doctors who conducted the evaluation but had no reason to doubt their competency finding. Counsel did not know if the petitioner's doctors were state employees and was not concerned that the doctors were pressured into finding the petitioner competent. The State believed it had a good case for the death penalty but offered to let the petitioner plead guilty to life with the possibility of parole. On October 24, 1983, counsel and co-counsel met with the petitioner and the petitioner's family in order to discuss the State's offer. Counsel was concerned that the jury would be enraged by the facts of the case, and counsel advised the petitioner about the consequences of not accepting the State's offer. The attorneys told the petitioner and his family about the possibility of the death penalty and allowed the petitioner and his family to talk privately. Counsel stated that he did not remember the trial judge coming into the room while he talked with the petitioner and the petitioner's relatives and that he did not remember threatening the petitioner or giving the petitioner an ultimatum. That same day, counsel filed a motion for the petitioner to have an independent psychological evaluation. He said he filed the motion just in case the first evaluation became insufficient and to preserve the issue. If the petitioner had not pled guilty, counsel would have argued the motion to the trial court. Counsel read the petitioner's police confession and also would have argued a motion to suppress if the

petitioner had not pled guilty. He said he did not remember telling the petitioner's mother that the petitioner would get out of prison in ten years.

On cross-examination, counsel testified that he could communicate with the petitioner and that the petitioner was always responsive. The petitioner never denied shooting the victim and never indicated that his confession to police was involuntary. Counsel was unaware of any reason to suppress the petitioner's confession, and counsel would have represented the petitioner at trial. The petitioner appeared to have no defenses to the crimes, but counsel could have argued that the petitioner did not premeditate the killing.

Co-counsel testified that he had been practicing law since 1979, was appointed to represent the petitioner, and began preparing for the petitioner's trial. The defense attorneys talked with the victim's sister at the preliminary hearing and talked with sheriff's department personnel. The defense had copies of the petitioner's confession, and co-counsel talked with the petitioner about the case. The petitioner's attorneys discussed second degree murder with him, but given the petitioner's confession, co-counsel thought "the likelihood of that . . . [was] slim and none." The attorney general told co-counsel that this was a death penalty case, and the State refused to make a plea offer. However, the State later offered to let the petitioner plead guilty in return for a sentence of life without the possibility of parole. Co-counsel refused that offer. About one week before the petitioner's guilty plea, the State offered to let the petitioner plead guilty to life. Co-counsel visited the petitioner in jail, told him about the offer, and told him to think about it. On October 24, 1983, the petitioner's attorneys talked with him again about the State's offer. The petitioner told co-counsel that he did not know what to do, and the petitioner discussed the offer with relatives. Co-counsel thought it was in the petitioner's best interests to accept the offer, and he did not remember the petitioner's saying that he did not want to plead guilty. He said that the trial judge was not present in the conference room on October 24 and that the petitioner "got a sweet deal." Co-counsel acknowledged filing a motion to suppress the confession and said he would have argued the motion if the petitioner had not pled guilty. On cross-examination, co-counsel testified that he had no concerns about the petitioner's mental capacity. He believed the petitioner confessed to police voluntarily and pled guilty voluntarily. Co-counsel did not force the petitioner's family to convince the petitioner to accept the State's offer, and neither of the petitioner's attorneys was afraid to go to trial.

The petitioner testified that co-counsel told him about the State's offer and told him to think about it. On October 24, 1983, both attorneys talked with him about the offer. At some point, the attorneys took the petitioner into a room behind the judge's chambers, and the petitioner told co-counsel that he did not want to plead guilty. Co-counsel told the petitioner that he was not going to allow the petitioner to testify and that he would not represent the petitioner at trial. Before the petitioner's family came into the conference room, the trial judge came into the room and told the petitioner "the likelihood that [if] I didn't [accept the State's offer,] he would be sentencing me to death row." The judge was in the room for three to five minutes, and the petitioner "was terrified that if I didn't take the plea that what he said was going to be true." The petitioner decided to accept the State's offer because he was not receiving proper representation, his family wanted him to plead

guilty, and he was afraid of what the trial judge told him.

The petitioner testified that on the afternoon of August 11, 1983, the victim told him that he could not see their child. That night, the petitioner was angry and unable to sleep. About 5:00 a.m. on August 12, the petitioner telephoned the victim. He acknowledged that his conversation with her "ticked [him] off" and caused him to commit the crimes. He said that if he had gone to trial, the evidence would have shown that he acted in the heat of passion. He believed that a jury would have convicted him of second degree murder because the killing was based on anger and rage. After Tommy Hunt drove the petitioner to the sheriff's department, the petitioner walked inside, told a police dispatcher that he had shot someone, and told the dispatcher that he "might need an attorney." A police officer put the petitioner into an interview room, and Officer Joe Shepherd came into the room and began asking the petitioner questions about the crimes. Shepherd did not advise the petitioner of his rights. The petitioner told Shepherd that he might need an attorney and had not slept. Shepherd told the petitioner that he could sleep after the petitioner gave a statement. The petitioner acknowledged that he gave an audiotaped confession and that a transcript of his confession showed Shepherd advised him about his rights. The petitioner testified that he did not know if he understood his right to an attorney or his right against self-incrimination. He said that the victim's sister's neighbor, Ruby Merrick, testified at the preliminary hearing that she saw another person at the scene of the crimes and that Merrick could have testified for him at trial. The petitioner tried to tell one of his attorneys about the circumstances of the offenses, but the attorney would not listen to him.

The petitioner testified that he did not recall talking with his attorneys about the State's burden of proof, premeditation, or deliberation and that the attorneys never talked about the aggravating or mitigating factors the State would have to prove in order for the petitioner to get the death penalty. Regarding his psychological evaluation, the petitioner testified that Dr. Nicholas House met with him for forty-five minutes but did not give him any psychological tests. About one week later, the petitioner met with Dr. Alvin Summar. Dr. Summar only looked over some paperwork, and the petitioner told his attorneys that he did not receive an adequate mental evaluation.

On cross-examination, the petitioner testified that he was not denying he killed the victim. However, he said that he did not set fire to the victim's sister's home and that the house was on fire when he arrived. He said that he had been to juvenile court about seventeen times over prior incidents but that he was not familiar with the legal system. The petitioner acknowledged that he obtained his GED and an apprenticeship certification in residential electrical wiring while in prison. He also earned a diploma from the Cleveland Institute of Electronics and Electronic Technology, completed several Bible study courses, and worked for the disciplinary board. He acknowledged that a jury could have convicted him of first degree murder and that he was concerned about the death penalty. However, he did not think the killing warranted that punishment. He acknowledged that at the guilty plea hearing, the trial court advised him of his rights and that he would be sentenced to life with the possibility of parole after serving thirty years in confinement. At the guilty plea hearing, the petitioner told the trial court that he understood the charges against him, that he wanted to plead

guilty, that counsel went over a guilty plea form with him, that he was satisfied with his attorneys' representation, that he was pleading guilty voluntarily, and that he had not been pressured into pleading guilty. He testified that he lied to the trial court and that he pled guilty because he was pressured by counsel and intimidated by the trial judge. He acknowledged attending a recent parole hearing and said that he may have told the parole board he set fire to the victim's sister's home by throwing a cigarette into a trash can. However, the petitioner testified that he may have lied to the parole board because he was trying to get out of prison.

Tommy Hunt testified for the State that he was a minister in Bradford, Tennessee at the time of the crimes. On the morning of August 12, 1983, the petitioner came to Hunt's home and knocked on the door. Hunt had never met the petitioner before that morning but talked with the petitioner about the crimes for fifteen or twenty minutes. The petitioner asked Hunt to drive him to the sheriff's department, and Hunt and his father-in-law drove the petitioner to the sheriff's department in Trenton, Tennessee. The petitioner was unusually calm, did not appear to be under the influence of alcohol, and appeared to understand what the petitioner was doing and saying. On cross-examination, Hunt testified that when they arrived at the sheriff's department, he went inside with the petitioner and told an officer, "This gentleman would like to say something to you."

Joe Shepherd, the Gibson County Sheriff, testified that he was the lead investigator in the case and interviewed the petitioner on August 12, 1983. The petitioner signed a waiver of rights form, and Shepherd recorded the petitioner's statement. During the petitioner's interview, the petitioner admitted setting fire to the house in order to get the victim to come outside. The petitioner did not appear to be under the influence of any substance and told Shepherd that he did not use alcohol or drugs. Shepherd interviewed Ruby Merrick, and she did not tell him that she saw someone other than the petitioner at the scene of the crimes. Shepherd made his case file available to the petitioner's attorneys and withheld nothing from them. On cross-examination, Shepherd testified that he always Mirandized suspects. He identified a transcript of the petitioner's confession and acknowledged that the transcript demonstrated that the petitioner made some statements about the crimes before Shepherd Mirandized him. He said the petitioner was "jumping through his skin to make a statement" and acknowledged that the petitioner may have blurted out some information before he could read him <u>Miranda</u> warnings. He acknowledged that the petitioner was not free to leave at the time of the confession.

The State recalled the petitioner's attorneys to the stand, and both attorneys testified that the petitioner never claimed that he requested an attorney or that he be allowed to sleep before his interview with Joe Shepherd. Co-counsel also stated that Ruby Merrick did not testify at the petitioner's preliminary hearing and that the petitioner never claimed someone else started the fire.

In a written order, the post-conviction court denied the petition for post-conviction relief. Regarding the petitioner's ineffective assistance of counsel claim, the post-conviction court noted that the petitioner's "full and explicit" confession about the crimes was an "insurmountable obstacle." The post-conviction court concluded that Joe Shepherd advised the petitioner of his <u>Miranda</u> rights and that the petitioner voluntarily waived those rights. The court noted that although

the petitioner claimed he gave his confession after being deprived of sleep, the petitioner did not testify at the evidentiary hearing that a lack of sleep prevented him from truthfully and accurately recounting the crimes. The court also noted that the petitioner's psychiatric evaluation revealed no mental problems. The court concluded that the petitioner would have been convicted of first degree murder if he had gone to trial, that the petitioner's guilty plea prevented the State from seeking the death penalty, and that his guilty plea spared the petitioner and his family from the possibility that he would be executed. Given the petitioner's confession, the court concluded that the petitioner's attorneys could not have gotten a more favorable outcome if the petitioner had gone to trial and determined that the petitioner had "very effective counsel." The post-conviction court did not address whether the petitioner's guilty plea was voluntary.

## II. Analysis

The petitioner claims that he received the ineffective assistance of counsel because his trial attorneys did not seek an independent psychiatric evaluation for him. He contends that an independent evaluation was necessary because (1) the doctors who evaluated him were from the same community where the crimes occurred, were employed by the State of Tennessee, and had a conflict of interest and (2) that the doctors did not perform a sufficient examination to determine his mental state. The petitioner also claims that he received the ineffective assistance of counsel because his attorneys failed to suppress his confession and that his guilty plea was involuntary because his trial attorneys, the trial judge, and his family coerced him into pleading guilty. The State claims that the trial court properly denied the petition for post-conviction relief. We conclude that although the evidence does not preponderate against the post-conviction court's conclusion that the petitioner received the effective assistance of counsel, the case must be remanded because the court failed to address the voluntariness of the petitioner's guilty plea.

Because the petitioner filed his petition for post-conviction relief prior to the enactment of the Post-Conviction Procedure Act of 1995, he bears the burden of proving the factual allegations in his petition by a preponderance of the evidence. State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App. 1991). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id. "To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466

U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). In evaluating whether the petitioner has met this burden, this court must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370.

When a defendant enters a guilty plea, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243, 89 S. Ct. 1709, 1712 (1969). Therefore, in order to comply with constitutional requirements, a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31, 91 S. Ct. 160, 164 (1970). In determining whether a petitioner's guilty plea was knowing and voluntary, this court must look at the totality of the circumstances. State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). "This court is bound by the post-conviction court's findings unless the evidence preponderates otherwise." Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

We agree with the post-conviction court that the petitioner received the effective assistance of counsel. The petitioner's trial attorneys testified that the petitioner had a mental evaluation at Gibson County Mental Health Center, that he was found to be competent, and that they had no reason to question the doctors' conclusions. Although the petitioner contends that an independent evaluation was necessary because his doctors had a conflict of interest and because his evaluation was insufficient, he has presented no proof to support his claims. He did not call Drs. House or Summar to testify and presented no evidence that they had a conflict of interest or that his evaluation was insufficient for them to conclude he was competent. The petitioner's attorneys testified that they filed a motion for an independent psychological evaluation but that the petitioner pled guilty before they could argue the motion. One of the petitioner's attorneys testified that he would have argued the motion if the petitioner had not pled guilty. We conclude that the petitioner has failed to show that his attorneys rendered deficient performance or that he was prejudiced by any deficiency.

The petitioner also claims for the first time on appeal that his attorneys should have suppressed his confession. However, a motion to suppress the petitioner's confession was introduced into evidence at the evidentiary hearing, and one of the petitioner's attorneys testified that he would have argued the motion if the petitioner had not pled guilty. Thus, the petitioner has failed to show that his attorneys rendered deficient performance. Moreover, even assuming arguendo that the attorneys should have argued the motion before the petitioner's guilty plea, the post-conviction court concluded that Joe Shepherd Mirandized the petitioner, that the petitioner gave his confession voluntarily, and that any such motion would have failed. Thus, the petitioner also has failed to demonstrate that he was prejudiced by any deficiency.

Finally, the petitioner contends that he was coerced into pleading guilty. Our review of the record reveals that the petitioner clearly raised this issue in his amended petition for post-conviction relief and that he questioned the evidentiary hearing witnesses extensively regarding their attempts to convince him to plead guilty. Nevertheless, in its order denying post-conviction relief, the post-

conviction court wrote that the petitioner's "only cognizable contention [at the hearing] was that he received the ineffective assistance from his counsel."  The court never addressed the petitioner's claim that his guilty plea was involuntary.  Tennessee Code Annotated section 40-30-111(b) provides, "Upon the final disposition of every petition, the court shall enter a final order, and . . . shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each such ground."  See also Tenn. Sup. Ct. R. 28 § 9(A).   In the instant case, the post-conviction court failed to make any written findings of fact regarding the voluntariness of the petitioner's confession.  Moreover, because the court made no oral pronouncement of its findings from the bench, we cannot conclude that the court's failure to enter written findings and conclusions was harmless.  See Tenn. R. App. P. 36(b); State v. Higgins, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987).  Therefore, we must remand the case in order for the post-conviction court to make findings of fact and determine whether the petitioner's guilty plea was voluntary.

### III.  Conclusion

Based upon the record and the parties' briefs, the judgment of the post-conviction court is affirmed in part and remanded for further proceedings consistent with this opinion.

 

_____
NORMA McGEE OGLE, JUDGE